UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| A.A., AS PARENT/GUARDIAN OF MINOR T.J., | CASE NO. C25-1377JLR |
| Plaintiff, | ORDER |
| v. | |
| SEATTLE PUBLIC SCHOOL DISTRICT, | |
| Defendant. | |

## I.    INTRODUCTION

Plaintiff A.A. ("Parent") appeals on behalf of her child, T.J., from the decision of

an administrative law judge ("ALJ") holding that Defendant Seattle Public School

District (the "District") upheld its obligations under the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*.  The court has reviewed the

administrative record (AR (Dkt. ## 16-20 (sealed))), the parties' submissions (Parent Br.

(Dkt. # 24); District Br. (Dkt. # 25); Parent Resp. (Dkt. # 26); District Reply (Dkt. # 27)),

ORDER - 1

the balance of the record in this case, and the applicable law.  Being fully advised,[1] the court AFFIRMS the ALJ's decision.

## II.    BACKGROUND

The court first discusses the statutory context and then turns to the factual and procedural background of this case.

**A.    Statutory Context**

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education." *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 432 (9th Cir. 2010) (cleaned up and citation omitted).  Under the IDEA, states that receive federal funding for public education must establish policies and procedures to ensure that all children with disabilities have access to a free appropriate public education ("FAPE").  20 U.S.C. § 1412(a)(1)(A); *see also id.* § 1400(d)(1)(A) (noting statutory purpose "to ensure that all children with disabilities have available . . . a free appropriate public education that emphasizes special education and related services designed to meet their unique needs"); *id.* § 1401(9) (further defining a FAPE).

The individualized education program ("IEP") is the "centerpiece" of the IDEA's system for delivering a FAPE to children with disabilities.  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (citation omitted).  An IEP is a

---

[1] Neither party requests oral argument (*see* Parent Br. at 1; District Br. at 1), and the court concludes that oral argument is not necessary to decide this appeal.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

written statement that must meet detailed statutory requirements and include statements of the child's present academic achievement, measurable annual goals, and the special education and related services that the child will receive. *See* 20 U.S.C. § 1414(d)(1)(A)(i).

Under the IDEA, as implemented in Washington, a child's parent, a state agency, or a school district may request an initial evaluation to determine if the child qualifies as a child with a disability.[2] *Id*. § 1414(a)(1). The IDEA requires "a full and individual initial evaluation" before a school district may provide special education and related services to a child. *Id*. § 1414(a)(1)(A). If the evaluation determines that a child qualifies for services, the IDEA then requires that the child have an IEP in effect "[a]t the beginning of each school year[.]" *Id*. § 1414(d)(2)(A).

An IEP team, which includes teachers, school officials, and the child's parents, develops the IEP. *See id*. § 1414(d)(1)(B). To do so, the IEP team must consider the results of the child's initial evaluation, as well as other statutory items. *See, e.g., id*. § 1414(d)(3)(A)-(B). Once an IEP is in effect, a school district must ensure that the child's IEP team (1) reviews the IEP at least annually to determine whether the child is achieving the IEP's goals, and (2) revises the IEP as appropriate to address, in relevant part, any lack of expected progress, the results of any reevaluations of the child, and information about the child provided by the parents. *Id*. § 1414(d)(4)(A).

---

[2] The IDEA refers to a "local educational agency[,]" sometimes referred to as a "LEA," rather than a school district. *See, e.g.*, 20 U.S.C. § 1414(a)(1)(A). The court refers to school districts to reflect Washington's implementation of the IDEA. *See* WAC 392-172A-01115.

ORDER - 3

In addition to reviewing a child's IEP, school districts must also regularly reevaluate students with disabilities every one to three years unless the parent and school district agree otherwise. *See id*. § 1414(a)(2)(B); WAC 392-172A-03015(2) (same). Either the school district or a parent may request a reevaluation of the child. *Id*. § 1414(a)(2).

When parents and educators disagree about "any matter relating to the identification, evaluation, or educational placement of the child," including providing a FAPE to the child and the contents of the child's IEP, they may turn to the dispute resolution procedures established by the IDEA. *See id*. § 1415(b)(6), (e), (f)(1)(B). The IDEA provides for a "due process hearing" before an impartial agency. *See id*. § 1415(f)(1)(A). The party requesting a due process hearing must do so within two years of the date the party knew or should have known about the act forming the basis of the party's complaint. *Id*. § 1415(f)(3)(C); *see also* WAC 392-172A-05080(2) (same, subject to exceptions that do not apply here). In Washington, ALJs at the Office of Administrative Hearings conduct IDEA due process hearings. RCW 28A.155.020; WAC 392-101-010(2). The IDEA requires the ALJ to decide a dispute "on substantive grounds based on a determination of whether the child received a [FAPE]." *Id*. § 1415(f)(3)(E)(i). "[A]t the conclusion of the administrative process, the losing party may seek redress in state or federal court." *Endrew F*., 580 U.S. at 392 (citing 20 U.S.C. § 1415(i)(2)(A)).

**B.      Factual and Procedural Background**

This action is an appeal of the ALJ's decision following a due process hearing in which Parent alleged that the District violated the IDEA and denied T.J. a FAPE

by failing to conduct an appropriate triennial evaluation and draft an appropriate IEP in May 2023 and 2024; failing to properly implement those IEPs; failing to develop a safety plan or take effective measures to protect T.J. from persistent racial harassment during the 2023-2024 school year; and failing to include Parent in educational planning.  (AR 2270-2272.)

    1.  <u>T.J.'s Background</u>

       T.J. has attended school in the District since kindergarten, and was in the 7th grade when the hearing took place in February 2025.  (AR 2411, 2350, 2268.)  T.J. was initially found eligible for special education services by the District in June 2019, and was reevaluated to consider his then-current educational needs in May 2020.  (AR 3026-47.)  The District's May 2020 reevaluation incorporated results from a January 2020 evaluation by private clinical psychologist Wendy Marlowe, Ph.D.  (AR 3030-46.)  Dr. Marlowe diagnosed T.J. with:

> attention deficit hyperactivity disorder [("ADHD")], combined type, cognitive disorders [Not Otherwise Specified], characterized as disorders of executive function, phonological disorder, specific reading disability (dyslexia), mathematics disorder (dyscalculia), disorders of scholastic skills such as spelling, handwriting and written language and anxiety disorder.

(AR 3303.)  Based on the assessment results, the evaluation team recommended that the District provide T.J. with specially designed instruction ("SDI") in reading, writing, math, and social/behavioral skills.  (AR 3026-28.)  He has been primarily in general education classes while in the District.  (AR 3119-25.)

//

//

ORDER - 5

   2.   May 2023 Reevaluation and IEP

In May 2023, the District completed a triennial reevaluation of T.J., led by school psychologist Heather Valentine, and developed a new IEP providing SDI across five core areas.  (AR 2344-81.)  From March to April 2023, Ms. Valentine reviewed T.J.'s educational history, previous evaluations, and medical history.  (AR 2353-54.)  Ms. Valentine administered a standardized assessment to evaluate T.J.'s cognitive functioning as requested by Parent.  (AR 2344-81.)  The results of that standardized assessment revealed significant variations between T.J.'s subscale scores on the verbal comprehension, working memory, and processing speed composites.  (AR 2354-57.)  Ms. Valentine also administered two standardized academic assessments to evaluate T.J.'s math, reading, and written language skills.  (AR 2357-58, 2362-65, 2377-79.)  The results of those specific tests indicated that T.J.'s ADHD and learning disabilities adversely affected his ability to access the District's general education reading, writing, and math curriculum.  (AR 2350, 2360, 2366, 2379-80.)

Ms. Valentine also evaluated T.J.'s social/behavior skills through rating scales completed by Parent, his general education teacher, and Christine DeCarufel, his special education teacher and case manager.  (AR 2367-72.)  The results indicated that T.J's impulsivity and difficulties with self-regulation affected his ability to follow teacher directions, transition between tasks independently, and interact positively with peers during group work.  (AR 2350.)  Ms. Valentine's evaluation of T.J's study/organizational skills indicated that T.J. had difficulty independently initiating tasks, planning tasks,

//

ORDER - 6

organizing materials, and editing and correcting errors before submitting classwork. (AR 2350.)

In May 2023, the reevaluation team and Parent met to review the triennial evaluation results which demonstrated that T.J. continued to qualify for special education services due to his ADHD, anxiety, and learning difficulties.  (AR 2381, 2350, 107-108 (Parent).)  Parent participated in the meeting with the reevaluation team and agreed to the triennial evaluation results.  (AR 2381, 2350-51, 2385-86, 107-08 (Parent[3]).)  T.J.'s IEP team developed the May 2023 IEP based on the results of the triennial evaluation and recommended SDI in math, reading, writing, social/behavior, and study/organization. (AR 2351.)

3.   Disciplinary Issues and Racial Bullying during the 2023-2024 School Year

In September 2023, T.J. began sixth grade.  (AR 2476.)  During this year, T.J. faced recurring disciplinary issues, peer altercations, and mutual identity-based bullying. In November 2023, Parent emailed Ms. DeCarufel reporting a video of two students directing a racial slur at T.J., who is Black.  (AR 2683.)  In December 2023, T.J. was involved in an altercation in which he swung a wooden ruler at another student in the hallway.  (AR 2687-88.)  Parent reported that the other student's parents informed her that T.J. had kicked the student multiple times and that the parents of the student stated they could file a police report.  (AR 2687-88.)  In early January 2024, Ms. DeCarufel informed Parent that a female student attacked T.J. during third period, and that a safety

[3] When citing the transcript of the due process hearing, the court includes the last name of the individual providing the testimony.

ORDER - 7

plan would be developed.  (AR 3137; *see also* AR 161 (Parent).)  On January 19, 2024, a transgender classmate ("Student Alpha") reported to Katie Gallagher, T.J.'s history teacher, that T.J. used their "dead name" and directed others to do so as well.  (AR 2693; *see also* AR 567-68 (Gallagher).)  When questioned about these allegations by Ms. Gallagher, T.J. reported that Student Alpha had previously called him the "N-word." (AR 2693.)  In February 2024, Ms. DeCarufel informed Parent that T.J.'s choice of language in class was pushing boundaries.  (AR 3133-34.)  In March 2024, Assistant Principal Amy Acquino informed Parent that T.J. had made a racial comment and gesture to a student of Indian descent.  (AR 2703-04.)  On April 18, 2024, an altercation between T.J. and Student Alpha occurred during which Student Alpha spit on T.J., and T.J. punched Student Alpha twice.  (AR 2715, 2707, 176 (Parent), 2712.)

These behavioral issues and peer conflicts escalated through May 2024.  On May 8, 2024, Ms. DeCarufel and Ticely Reeves, T.J's language arts teacher, met with T.J.'s parents to discuss T.J.'s altercation with Student Alpha and other disruptive behaviors including hallway roaming and laptop distractions.  (AR 185, 200, 323 (Parent); 555 (Reeves); 879, 888 (Father).)  During this meeting, Parent shared concerns about bullying and requested a safety plan.  (AR 185, 200, 323 (Parent); 555 (Reeves); 879, 888 (Father).)  On May 22, 2024, Parent e-mailed Ms. DeCarufel and other school staff that Student Alpha used "a derogatory term" against T.J. during History class.  (AR 2740-41.) Parent expressed that she did not want T.J. placed in a group setting with Student Alpha, and wanted to know "what options there are to prevent this going forward such as a safety plan being put into place."  (AR 2741.)  On May 28, 2024, Ms. DeCarufel offered

Parent dates for a meeting, and Parent responded that she was available for a Teams meeting on one of those dates. (AR 2738.) No meeting was actually held, however, because Parent did not receive a Teams invite, for which which Ms. DeCarufel apologized. (AR 2737-38.)

On May 29, 2024, Parent e-mailed Ms. DeCarufel and Barbara Dixon, the school principal, requesting that T.J. be transferred to a different special education teacher's class. (AR 2737.) Ms. Dixon responded that there were no other extended resource teachers that T.J. could be moved to, and said she had observed that Ms. DeCarufel was always responsive to T.J.'s needs. (AR 2737.) The next day, T.J. reported to Ms. DeCarufel during study skills that Student Alpha called him the N-word. (AR 2751, 2765.)

### 3. Parent's HIB Complaint and the District's Response

On May 30, 2024, Parent submitted a Harassment, Intimidation, and Bullying ("HIB") complaint, alleging that Student Alpha spit on T.J. and targeted him with racist and derogatory language. (AR 2795-96.) Principal Dixon investigated the allegations under HIB policies and procedures, ultimately issuing a decision letter finding, by a preponderance of the evidence, that T.J. had been subjected to bullying, harassment, and intimidation. (AR 2795-96 (decision letter).) To end the harassment and prevent recurrence, Principal Dixon imposed corrective action, and the school moved to limit classroom contact between the students and increase classroom adult support. (AR 2765-66, 2795-96.)

//

ORDER - 9

On June 2, 2024, Ms. DeCarufel instructed administrators and teachers to monitor all interactions between T.J. and Student Alpha.  (AR 2756.)  Ms. DeCarufel stated that T.J. reported Student Alpha quietly making inappropriate statements to him when unwatched, while T.J. loudly made inappropriate statements about Student Alpha to other peers.  (AR 2756.)  The school drafted safety plans for both students, and Parent received a copy on June 5, 2024.  (AR 2769, 2767, 2776-77 (Parent's red-lined version of the safety plan).)

    4.  <u>May 2024 IEP and the District's Implementation of the IEP</u>

On May 14, 2024, Ms. DeCarufel sent Parent T.J.'s IEP goal progress report, and the IEP team met the next day to develop his annual IEP.  (AR 2409-26, 2478-82.)  The team reviewed T.J.'s progress, drafted new annual goals, and established accommodations to support his access to the general education curriculum.  (AR 2416- 19.)  The finalized IEP mandated weekly SDI of 240 minutes in math, 90 minutes in reading, and 140 minutes in written language.  (AR 2420, 2423.)  Due to a staffing shortage, between October 4, 2023 and January 31, 2024, however, the District provided T.J. only 45 minutes per week of reading SDI instead of the required 90 minutes.  (AR 2280, 3167, 2304.)  T.J.'s SDI in other categories was not affected.  (AR 2304 (CL 52).)

In July 2024, Dr. Marlowe conducted an independent reevaluation of then 12-year-old T.J., measuring his IQ at 92 – a ten-point decline from his 102 score she had calculated in 2020.  (AR 3326.)  Dr. Marlowe opined that score discrepancies between the District's 2020 and 2023 Wechsler Intelligence Scale for Children evaluations resulted from educational deprivation, which should have triggered further examination

ORDER - 10

by the District.  (AR 437-442, 496-97 (Marlowe); 3324 ("[T.J.] is not getting his educational needs met in the [District]."))  She concluded that T.J. was not making meaningful educational progress, and that he had not kept up with learning expectations in comparison to peers because his scores were lower in 2024 than they were in the past. (AR 461-62 (Marlowe); 3308, 3322, 3318.)

### 5. The Administrative Proceeding and Decision

On September 11, 2024, Parent filed a due process hearing request alleging that the District violated the IDEA and denied T.J. a FAPE.  (AR 924-43.)  Following a five-day hearing in February 2025, the ALJ issued a Final Order on April 23, 2025, containing Findings of Fact ("FF") and Conclusions of Law ("CL").  (AR 2268-2317.)

The ALJ concluded that: (1) the District's May 2023 reevaluation of TJ was appropriate (AR 2293-97 (CL 12-25)); (2) T.J.'s May 2023 IEP contained appropriate goals in all areas of need, T.J. did not require SDI in the use of his accommodations, and the amount of SDI and placement were appropriate (AR 2298-2303 (CL 28-50)); (3) although the District provided about half of T.J.'s reading SDI between October 4, 2023 and January 31, 2024, the temporary shortfall was not a barrier to T.J.'s progress and thus the District did not deny T.J. a FAPE (AR 2304-05 (CL 52-54, 56)); (4) the placement, goals, and supports in T.J.'s May 2024 IEP were appropriate (AR 2305-09 (CL 57-72)); (6) the District provided the accommodations in T.J.'s May 2023 and May 2024 IEPs and did not inappropriately penalize T.J. for his disability (AR 2305, 2309-10 (CL 55, 73-80)); (7) while bullying took place, the District was not deliberately indifferent to it, and it was not so severe that it caused T.J. to derive no educational

ORDER - 11

benefit (AR 2311-12 (CL 82-88)); and (8) Parent was provided an opportunity to participate in the development of T.J.'s safety plan (AR 2312-13 (CL 90-91)).

### 6. Parent's Petition for Judicial Review

On July 22, 2025, Parent filed a petition for judicial review of the ALJ's decision in this court. (Compl. (Dkt. # 1).) Parent filed her opening brief on December 1, 2025, and her combined response and reply on February 13, 2026. (*See generally* Parent Br.; Parent Resp.) The District filed its combined response and opening brief on January 14, 2026, and its reply on March 26, 2026. (*See generally* District Br.; District Reply.) The petition for judicial review is now ripe for the court's consideration.

## III. ANALYSIS

Parent does not challenge all of the ALJ's findings and conclusions on appeal; rather, she contends that the District failed to: (1) conduct an appropriate triennial evaluation in May 2023; (2) implement the May 2023 IEP with fidelity regarding reading SDI; (3) draft an appropriate IEP in May 2023 that was reasonably calculated to confer meaningful educational benefit; (4) take effective measures to protect T.J. from the impact of persistent racial harassment and bullying on his ability to access a FAPE; and (5) include Parent in discussions and the drafting of a safety plan, denying her participation rights under the IDEA. (*See generally* Parent Br.) Parent also asserts that the court should accord no deference to the ALJ's decision because it is not thorough and careful. (Parent Br. at 9-12.) The court first discusses the applicable standard of review before turning to Parent's appeal.

//

**A.    Standard of Review**

The IDEA allows a party aggrieved by the findings and decision made at a due process hearing to bring a civil action.  20 U.S.C. § 1415(i)(2)(A).  In such an action, the court must receive the records of the administrative proceedings; hear additional evidence at the request of a party; and, basing its decision on the preponderance of the evidence, grant appropriate relief.  *Id*. § 1415(i)(2)(C).  Unlike judicial review of other agency actions, courts in IDEA cases review *de novo* whether a school district has provided a FAPE.  *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017) (emphasis added).  If an ALJ's factual findings are "thorough and careful" then courts may give "some deference" to those findings and may exercise their discretion to determine how much deference to give.  *Id*. (quotations omitted).

The court gives deference to an ALJ's decision "when it evinces his or her careful, impartial consideration of all the evidence and demonstrates his or her sensitivity to the complexity of the issues presented."  *J.W.*, 626 F.3d at 440 (cleaned up and citations omitted).  The court "treat[s] a hearing officer's findings as 'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions."  *R.B., ex rel. F.B.v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942-43 (9th Cir. 2007).  In addition, "credibility-based findings [of the ALJ] deserve deference unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion."

//

ORDER - 13

*Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 889 (9th Cir. 2001) (citation omitted).

"Normally, the party alleging a violation of the IDEA bears the burden of showing that the services received amounted to a denial of a FAPE." *M.C.*, 858 F.3d at 1200 (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005)).  In 2024, the Washington state legislature enacted a statute stating, "the school district has the burden of proof including the burden of persuasion and production, whenever it is a party to a due process hearing regarding" provision of a FAPE "for a student with a disability." RCW 28A.155.260.  When it comes to an appeal, "the party seeking relief [ ] bears the burden of demonstrating that the ALJ's decision was incorrect." *Crofts v. Issaquah Sch. Dist. No. 411*, 22 F.4th 1048, 1053 (9th Cir. 2022) (citation omitted).

Parent asserts that the ALJ's decision is not entitled to a high degree of deference because: (1) the ALJ was not actively involved in questioning witnesses to clarify his understanding; (2) the ALJ did not demonstrate familiarity with the evidence presented and the findings of fact were not careful or accurate based on certain errors in dates, citations, exhibit designations, and word use; and (3) the ALJ misunderstood and misapplied the law applicable to a determination of whether T.J. received a FAPE.  (*See* Parent Br. 9-12.)  The court concludes that the ALJ's decision is entitled to particular deference.

First, questioning witnesses is just one potential factor under which courts determine whether the ALJ's decision is thorough and careful; it is not an explicit requirement.  Parent relies on *Park, ex rel. Park v. Anaheim Union High Sch. Dist.*, 464

ORDER - 14

F.3d 1025, 1031 (9th Cir. 2006) to argue that "[i]n the Ninth Circuit, a hearing officer is expected to be engaged in the hearing and to question witnesses to ensure the record contained complete information and that he understood the testimony." (Parent Br. at 10.) The *Park* court, however, afforded the ALJ's determinations due weight after considering multiple factors, and did not establish a minimum threshold for ALJ questioning. *Park*, 464 F.3d at 1031. Here, the ALJ presided over a five-day hearing, heard testimony from nine witnesses, considered 79 exhibits, and issued a reasoned, 47- page decision. (*See* AR 2268-2315.) That the ALJ asked only one clarification question during this multi-day hearing (AR 558) is insufficient to show a lack of active involvement or a failure to comprehend the testimony and evidence.

Second, the court attributes the various incorrect dates, citations, and exhibit designations in the administrative decision to human error[4] that does not discount the ALJ's decision. The errors cited by Parent to illustrate that the ALJ's findings of fact were not careful or accurate do not leave the court with a "definite and firm conviction that a mistake has been committed." *Amanda J.*, 267 F.3d at 890. Although the ALJ incorrectly stated that T.J. was in eighth grade rather than seventh grade at the time of the hearing, the decision accurately noted T.J.'s date of birth, his age, and his correct grade level during the school year at issue. (AR 2349, 2273 (FF 1), 2277 (FF 18).) Additionally, Parent does not specifically identify what part of Ms. DeCarufel's

---

[4] Parent's brief includes citation errors as well, which can occur when there is a lengthy record. (*See* Parent Br. at 10 (incorrectly citing AR 2280 when highlighting the ALJ's incorrect citations).)

ORDER - 15

educational qualifications that the ALJ reported was inaccurate. (*See* Parent Br. at 11; *see also* AR 630-31 (describing Ms. DeCarufel's educational qualifications), 2274 (FF 5 n.4).) Furthermore, Parent does not demonstrate how the ALJ's alleged "mix-up" of T.J.'s 2020 and 2024 full-scale IQ scores, or the stated hiring date of Dr. Marlowe—which aligned with her first billing entry—was material or substantively impacted the ALJ's ultimate conclusions. (*See* Parent Br. at 11; *see also* AR 3326-27 (FF 49).) Finally, the court is not convinced by Parent's credibility argument that the ALJ erred in his "total disregard" of Dr. Marlowe's testimony. (Parent Reply at 3; *see* AR 2290-91 (FF 110-12), 2294 (CL 13).)

The court also disagrees that the ALJ made errors in his findings regarding racial harassment that warrant less deference. Parent asserts that the ALJ misidentified the date of the altercation between T.J. and Student Alpha as May 18, 2024, instead of April 18, 2024. (Parent Br. at 11.) The email cited by the ALJ in that finding, however, explicitly contained that incorrect May 18 date. (*Compare* AR 2287 (FF 84) *with* AR 2755.) Parent also asserts that the ALJ incorrectly found that T.J.'s teacher was unaware of the bullying until May 8, 2024. (Parent Br. at 11.) Yet, the ALJ's finding that Ms. Reeves had not observed negative interactions and only learned of the conflicts at the May 8, 2024 meeting is fully consistent with the record. (AR 540 (Reeves) (did not observe any interactions between the students); AR 558 (Reeves) (same); AR 555 (Reeves) (Parent and Father reported concerns about bullying during meeting). Parent additionally claims that the ALJ erred in finding that she was provided an opportunity to draft a safety plan (Parent Br. at 11), but the record demonstrates that Parent provided Principal Dixon with

ORDER - 16

a red-lined version of the safety plan on June 5, 2024 (AR 2766-67, 2312 (CL 90)). Furthermore, Parent's argument that the ALJ's single use of the word "epitaph" in place of "epithet" proves a lack of thorough and careful consideration is not compelling to the court.

Finally, as explained in greater detail below, the ALJ did not misunderstand or misapply the law applicable to whether T.J. received a FAPE. *See infra* § B. While the court acknowledges the ALJ's technical errors in dates, citations, and exhibits, these errors do not materially affect the substance of the ALJ's findings and conclusions. Therefore, the court accords considerable deference to the ALJ's decision, except as to the specific clerical errors identified.

**B.    Review of the ALJ's Findings and Conclusions**

Having determined that the ALJ's decision is entitled to deference, the court now reviews the challenged portions of the ALJ's decision.

1.    May 2023 Triennial Evaluation

First, Parent contends that the ALJ erred in determining that the District's May 2023 reevaluation of T.J. was appropriate. (Parent Br. at 12-16.) Parent asserts that the May 2023 triennial evaluation was deficient because the District: (1) failed to examine discrepancies between the May 2023 evaluation and previous evaluations; (2) failed to accurately evaluate reading comprehension; (3) relied in part on invalid data; (4) failed to identify all disabilities that might require SDI; (5) used assessment results that were not reliably calculated or calculable; and (6) failed to determine whether and to what extent T.J. needed additional services or modifications to meet his annual goals. (*Id.*) Parent's

assertions rely on data from Dr. Marlowe, who evaluated T.J. as part of a publicly funded evaluation in 2020 and a private evaluation funded by Parent in 2024.  (*Id*. at 13.)  Dr. Marlowe testified that the discrepancies between T.J.'s 2020 and 2023 standardized test scores: (1) did not make sense and should have triggered further examination and consideration (AR 437-38, 481 (Marlowe)); (2) were likely due to examiner error caused by either incorrectly administering the test or incorrectly scoring the test (AR 439 (Marlowe)); and (3) revealed T.J. had not kept up with learning expectations in comparison to peers because his scores were lower in 2024 which meant he had failed to make meaningful educational progress (AR 461 (Marlowe)).  The District counters that the ALJ correctly determined that the May 2023 reevaluation was appropriate, contending that the "IDEA does not require that school districts resolve any purported discrepancies between prior and existing data – it instead requires school districts to consider all available data in determining a student's educational needs."  (District Br. at 20-24.)  The District maintains that it considered all existing data and outside reports as required.  (*Id*. at 21.)

Under the IDEA, "an 'appropriate' public education need not be the 'absolutely best;' it must only provide 'a basic floor of opportunity' that is 'individually designed to provide individual benefit.'"  *Forest Grove Sch. Dist. v. Student*, 665 F. App'x 612, 614 (9th Cir. 2016) (citation omitted).  Under WAC 392-172A-03020, evaluations must use "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student, including information provided by the parent[.]"  WAC 392-172A-03020.  Evaluations may not "use any single measure or

assessment as the sole criterion for determining [ ] a student's eligibility for special education services and for determining an appropriate educational program for the student[.]" WAC 392-172A-03020(2)(b). Reevaluations "must review 'existing evaluation data'" on the student. WAC 392-172A-03025. School districts have discretion, however, in selecting the diagnostic tests they use to determine special education eligibility. *See Ford ex rel. Ford v. Long Beach Unified Sch. Dist.*, 291 F.3d 1086, 1088-89 (9th Cir. 2002) (holding that a school district need not use any traditional IQ test to assess for specific learning disability).

Here, in its May 2023 reevaluation, the District complied with these requirements by reviewing existing data, including: (1) T.J.'s educational history, consisting of report cards, state and District-wide assessment performance, and IEP goal progress; (2) his then-current special education services, attendance records, and diagnoses of ADHD and anxiety; (3) Dr. Marlowe's 2020 evaluation, which was attached to the reevaluation; (4) T.J.'s medical history and medication; and (5) Parent's input, incorporated via questionnaire responses and rating scales. (District Br. at 2-3; AR 2344-81 (FF 9-11, 15- 18).) Therefore, the District reviewed existing evaluation data in its May 2023 reevaluation in accordance with the applicable regulations. (*See* AR 2351 (reevaluation team's recommended service areas).)

Thus, the court concludes that the ALJ did not err in determining that the District's May 2023 reevaluation of T.J. was appropriate.

//

//

ORDER - 19

2. Implementation of the May 2023 IEP

Second, Parent argues that although the ALJ correctly identified the District's "material failure to implement the May 2023 IEP" when it provided T.J. 45 minutes per week of reading SDI between October 4, 2023 and January 31, 2024[5] instead of the full 90 minutes included in the May 2023 IEP, the ALJ nevertheless erred when he found that the failure to provide the full amount of reading SDI "was of no consequence to [T.J.'s] receipt of a FAPE." (Parent Br. at 17; *see* AR 2304-2305.) The District counters that the ALJ correctly determined this temporary shortfall in reading SDI did not deny T.J. a FAPE because he met and even surpassed his reading goals, demonstrating that the missed SDI was not a barrier to his progress and did not cause substantive harm. (District Br. at 24-26; AR 2304-05 (CL 52, 54), 2457.)

In the Ninth Circuit, a "*material* failure to implement an IEP violates the IDEA." *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007) (emphasis in original). "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Id.* "[T]he materiality standard does not require that the child suffer demonstrable educational harm in order to prevail." *Id.* "However, the child's educational progress, or lack of it, may be probative of whether there has been

---

[5] Parent states that T.J.'s May 2023 IEP included 150 minutes per week of SDI in reading. (Parent Br. at 17.) The May 2023 IEP, however, provided 150 minutes per week of SDI in reading from May 4, 2023 to June 30, 2023. (AR 2401.) The District was to provide T.J. with 90 minutes per week of SDI in reading from July 1, 2023 to May 3, 2024, which is the timeline at issue here. (AR 2401.)

ORDER - 20

more than a minor shortfall in the services provided." *Id*. For example, if "the child is not provided the reading instruction called for and there is a shortfall in the child's reading achievement, that would certainly tend to show that the failure to implement the IEP was material." *Id*. "On the other hand, if the child performed at or above the anticipated level, that would tend to show that the shortfall in instruction was not material." *Id*.

Here, the District provided T.J. 45 minutes of SDI in reading instead of 90 minutes from October 3, 2023 to January 31, 2024 due to a "staffing shortage." (AR 3167, AR 2280 (FF 42), 2304-05 (CL 52).) The record establishes that T.J continued to make progress in reading despite the reduced minutes. T.J. met his IEP reading goal, earned an "A" grade in his general education language arts class, and ultimately surpassed his baseline reading target by approximately 25%. (AR 2436, 3120-21, 2304-05 (CL 54).) Because T.J. performed at or above the anticipated level, the court finds the shortfall in instruction was not material. *See Van Duyn*, 502 F.3d at 815. Thus, the court concludes that the ALJ did not err when he concluded that the temporary shortfall of reading SDI did not deny T.J. a FAPE.[6]

3. Appriopriateness of the May 2023 IEP

Third, Parent asserts that the ALJ erred in concluding that the District's May 2023 IEP was appropriate because: (1) "a poor evaluation cannot be a solid foundation for an

---

[6] The court need not address the arguments Parent raised for the first time on appeal regarding the District's alleged failure to provide prior written notice or a denial of parental participation related to the implementation claim. *See* 28 U.S.C. § 1415(f)(3)(B).

ORDER - 21

appropriate IEP[;]" and (2) the ALJ placed the burden of compliance on Parent instead of the District. (Parent Br. at 19-20.) The District counters that: (1) because the May 2023 reevaluation was appropriate, Parent's argument regarding the appropriateness of the May 2023 IEP also fails; (2) Parent's argument is conclusory because she does not identify specific components of the IEP that were affected or rendered inappropriate by the May 2023 triennial reevaluation; and (3) the ALJ did not improperly place the burden of compliance on Parent because the ALJ's legal conclusions regarding the appropriateness of the May 2023 IEP were not based on Parent's lack of disagreement. (District Br. at 28-29.)

The court agrees with the District. As discussed above, the court concluded that the ALJ did not err in determining that the District's May 2023 reevaluation of T.J. was appropriate. Furthermore, the court does not find that the ALJ's conclusions about the appropriateness of the May 2023 IEP were based on Parent's lack of disagreement with the goals, or attempted to shift the burden of compliance with the IDEA from the District to Parent. (*See* AR 2278-79, 2297-2303 (CL 26-50).) "While the onus is on the District to adequately address student needs through the IEP process, the lack of contemporaneous concern over the IEP's adequacy from *any party* tends to suggest the IEP was appropriate given the information *available at the time.*" *W.S. v. Edmonds Sch. Dist.*, No. C21-0390JCC, 2022 WL 2479149, at *5 (W.D. Wash. July 6, 2022) (emphasis in original). Thus, the court concludes that the ALJ did not err in determining that the District's May 2023 IEP was appropriate.

//

ORDER - 22

4.   Persistent Racial Harassment and Bullying on T.J.'s Ability to Access a FAPE

Parent asserts that the ALJ erred by requiring Parent to show that T.J. received "no educational benefit" as a result of the District's failure to take effective measures to protect T.J. from the effect of persistent racial harassment and bullying on his ability to access a FAPE – a standard that, Parent argues, was never intended to be interpreted literally.  (Parent Br. at 21-26.)  The District contends that: (1) Parent's assertions regarding the alleged bullying are unsupported in the record; (2) the ALJ did not assign the burden of proof to Parent; and (3) the ALJ applied the correct legal standard and correctly determined that T.J. received an educational benefit.  (District Br. at 30-40.)

The court concludes that the ALJ used the correct legal standard under the IDEA.[7] To determine whether a claim of bullying denied a student a FAPE, the ALJ was required to consider whether: (1) the student was the victim of bullying; (2) the District was "deliberately indifferent" to the bullying; and (3) the "abuse [was] so severe that the child can derive no benefit from the services that he or she is offered by the school district[.]" *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 650-51 (9th Cir. 2005); *see also P.B. by & Through T.B. v. Thorp Sch. Dist.*, No. 1:20-CV-03032-SAB, 2021 WL 6275114, at *10 (E.D. Wash. Mar. 29, 2021) (applying the *M.L.* standard).  "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely,

---

[7] The court has reviewed the cases Parent cited to support her argument that the standard used in *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634 (9th Cir. 2005) is not appropriate and does not find them persuasive.

ORDER - 23

and a failure to act upon that likelihood." *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016) (cleaned up).

The court concludes that the ALJ did not err in determining that T.J. was subjected to racial bullying, but that the District's actions did not result in denial of a FAPE. (*See* AR 2312 (CL 88) ("[T]he court is very sympathetic to the difficulty that Student Alpha's behavior raised and the emotional harm it caused [T.J.]").) No one, especially a child, should be forced to endure being called the "N-word." While the court recognizes the emotional harm caused by the egregious use of racial slurs, the record supports the ALJ's conclusion that the District was not deliberately indifferent and that the bullying was not so severe as to deprive T.J. of an educational benefit. (AR 2311 (CL 82).)

The District took appropriate and reasonable steps to address the bullying, including implementing physical seating separations in class to limit interactions between T.J. and Student Alpha. (AR 539-40 (Reeves); 673 (DeCarufel); 566-67 (Gallagher); 2795-96, 2756, 2767, 2776-77.) T.J.also met or made progress towards his IEP goals during this time, demonstrating that he continued to receive an educational benefit from the District's services. (AR 2436-38, 2345, 2335-36.) The District's responsive measures constituted "clear evidence, not of indifference, but of concern tempered with action." (AR 2311-12 (CL 83-86).) Furthermore, the court is not persuaded by Parent's argument that the ALJ improperly shifted the burden of proof, as the administrative analysis focused appropriately on the sufficiency of the District's response to the peer conflict. (*See* AR 2311-12 (CL 82-85, 88).) Thus, the court concludes that the ALJ did not err in concluding that T.J. received a FAPE during the 2023-2024 school year.

5. Parent's Participation Rights Under the IDEA

Lastly, Parent contends that the ALJ erred in concluding that the District did not violate the IDEA's parental participation requirements by failing to include her in discussions about T.J.'s safety and the drafting of a safety plan in Spring 2024.  (Parent Br. at 26-28.)  The District asserts that the ALJ correctly concluded that: (1) the safety plan was not subject to the IDEA's parental participation requirements; and (2) Parent was provided an opportunity to meaningfully engage in the safety plan's development because the District provided her a copy of the safety plan, included her in discussions concerning the plan, and gave her an opportunity to propose changes.  (District Br. at 40-42 (citing AR 2312 (CL 90))).

"Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA."  *Amanda J*., 267 F.3d at 892.  "An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed."  *Id.*  The parent of a child with a disability must be afforded an opportunity to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a FAPE to the child.  34 C.F.R. § 300.501.

Here, the record reflects that the District provided Parent the opportunity to meaningfully participate in both the IEP process and creation of the safety plan.  On May 8, 2024, the District met with Parent to discuss her concerns regarding bullying and request for a safety plan.  (AR 200, 323 (Parent); AR 555 (Reeves): AR 879, 888 (Father); AR 2286 (FF 82).)  When the IEP team convened on May 15, 2024, to develop

T.J.'s annual IEP, Parent did not raise concerns of bullying. (AR 323-34 (Parent), 2409-26.) Furthermore, Parent was included in the development of the safety plan: the safety plan was discussed with her at a meeting, a copy of the safety plan was transmitted to her via email, and she subsequently returned a copy containing her explicit revisions. (*See* AR 200-01 (Parent), 2769, 2776-77.) Parent fails to establish that the ALJ erred in concluding that the District provided Parent an opportunity to meaningfully engage in the IEP and safety plan process. Thus, the court concludes that ALJ did not err in determining that the District did not violate the IDEA's parental participation requirements.

## IV.    CONCLUSION

For the foregoing reasons, the court AFFIRMS the decision of the ALJ and denies Parent's Appeal (Dkt. # 1). The court DIRECTS the clerk to enter judgment for the District and to close this action.

Dated this __6th__ day of July, 2026.

JAMES L. ROBART
United States District Judge

ORDER - 26